IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| K.F.C., a minor, by and through her guardian, ERIN CLARK, on behalf of herself and all others similarly situated, | ) ) ) | |
| | ) | Case No. 3:21-cv-00009-DWD |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Hon. David W. Dugan |
| SNAP INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT SNAP INC.'S
MOTION TO COMPEL ARBITRATION AND DISMISS,
<u>OR IN THE ALTERNATIVE, STAY CLAIMS</u>**

**<u>FACTUAL BACKGROUND</u>**

Plaintiff K.F.C. ("Plaintiff") is currently a thirteen year-old child and a citizen of the State of Illinois. Compl. ¶ 7. As a citizen of Illinois, Plaintiff's biometric privacy information is protected by statute, the Illinois Biometric Information Privacy Act (740 ILCS 14/1, *et seq.*)("BIPA"), and Plaintiff, through her mother as guardian has sued Snap, Inc. for violating her rights and the rights of a similarly situated class of Snapchat users. Defendant has moved to compel arbitration of Plaintiff's case, claiming that, when she was eleven years-old, she agreed to waive her constitutional right to a trial by jury and to, instead, have her case heard by an arbitrator. Plaintiff opposes Defendant's motion to compel arbitration for the reasons set forth below.

BIPA prohibits private entities from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric information[1] unless it: (1) informs that person in writing that identifiers and information will be collected and/or stored, (2) informs the person

---

[1] A biometric identifier includes "a retina or iris scan, fingerprint, voice print, or scan of hand and face geometry." *Id.* ¶ 14.

in writing of the specific purpose and length for which the identifiers or information is being collected, stored or used, (3) receives a written release from the person for the collection of that data, and (4) publishes publicly available written retention schedules and guidelines for permanently destroying said data. See 740 ILCS 14/15(a) and (b). In addition, no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." 740 ILCS 14/15(c)." *Id.* ¶ 1.

Plaintiff's cause of action derives from her use of a phone application developed and operated by Defendant called Snapchat. *Id.* ¶ 17. Snapchat is a camera application ("app") that was created to help people communicate through short videos and images called "Snaps." *Id.* Plaintiff used Snapchat's Lenses and Filters features, which "allow users to add special effects to their Snaps, including editing their appearances as well as their voices." *Id.* ¶¶ 18, 20. Through her use of the app, Defendant collected Plaintiff's biometric identifiers. *Id.* ¶ 5. Defendant's collection of Plaintiff's biometric identifiers violates the Illinois Biometric Information Privacy Act (740 ILCS 14/1, *et seq.*) by: (1) failing to provide a "publicly available retention schedule or guidelines for permanently destroying users' biometric privacy information" in violation of BIPA Section 15(a), (2) failing to inform or receive a written release from Plaintiff or Members of the proposed Class before collecting her biometric identifiers in violation of BIPA Section 15(b), and (3) "profit[ing] from the collection of users' biometric identifiers" in violation of BIPA Section 15(c). *Id.* ¶¶ 1, 62, 67-71, 102.

Defendant claims that Plaintiff agreed to arbitrate her claims pursuant to the Snapchat Terms of Service and Arbitration Agreement. ECF No. 26, at Pg. 7. However, Plaintiff has disaffirmed any contract which purportedly existed between the parties. As stated in her Class Action Complaint, given her disaffirmance of the contract, Plaintiff "cannot be bound by any agreement Snap may say applies." Compl., at ¶ 7.

## ARGUMENT

### I.  Legal Standard

Under the Federal Arbitration Act, 9 U.S.C.S. §§ 1, *et seq*. ("FAA"), arbitration must be compelled when the following three elements are established: "a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005). The court reviews a motion to compel arbitration under the summary judgment standard. *Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002). Thus, the Court must accept the non-movant's evidence as true and draw all reasonable inferences in her favor. *Id.* If the party opposing arbitration demonstrates that there is a genuine issue of material fact concerning the existence of an agreement to arbitrate, the issue shall proceed to trial. *Id.* However, "[a] trial to determine arbitrability is required ... only if the issue an evidentiary hearing would resolve is fairly contestable." *Am. Int'l Specialty Lines Ins. Co. v. Elec. Data Sys. Corp.*, 347 F.3d 665, 671 (7th Cir. 2003); *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 880–81 (N.D. Ill. 2020).

### II.  Choice of Law

The court must apply Illinois state law to this matter. A federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir.1994). The *Erie* doctrine extends to choice-of-law principles; thus, a federal court exercising diversity jurisdiction must also apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941); *Midwest Grain Prods. of Ill., Inc. v. Productization, Inc., et al.,* 228 F.3d 784, 787 (7th Cir. 2000). Defendant makes arguments under both California and Illinois law, but

never specifically requests that the court apply California law[2]. Regardless, California law is not applicable, and this court must apply Illinois choice-of-law principles as well as Illinois substantive law.

With respect to choice-of-law principles, Illinois has adopted the approach found in the Second Restatement of Conflict of Laws, which applies the broad rule that the rights and liabilities as to a particular issue are to be governed by the jurisdiction which retains the "most significant relationship" to the occurrence and the parties. *Morris B. Chapman & Assocs. v. Kitzman,* 193 Ill.2d 560, 568, 251, Ill. Dec. 141, 739 N.E.2d 1263 (2000); *Ingersoll v. Klein,* 46 Ill.2d 42, 44, 262 N.E.2d 593 (1970); Restatement (Second) of Conflict of Laws, Introduction, at VII–VIII (1971). Illinois courts have an interest in not being burdened with applying foreign law in the absence of strong policy reasons and a strong connection to the case. *Gridley v. State Farm Mutual Automobile Insurance Co.,* 217 Ill.2d 158, 175, 298 Ill. Dec. 499, 840 N.E.2d 269 (2005). Given that Plaintiff has brought this action in the United States District Court for the Southern District of Illinois on behalf of a putative class of Illinois Snapchat users for violations of an Illinois state statute, it is clear that Illinois retains the most significant relationship to the parties and causes of action.

While parties may agree to apply the laws of a particular state to disputes arising under a contract, there is no such agreement in this case. Under Illinois choice-of-law rules, a court must honor a contractual choice of law unless the parties' choice of law would violate fundamental Illinois public policy and Illinois has a materially greater interest in the litigation than the chosen

---

[2] *See Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809 (7th Cir. 2011) ("In the absence of [a request to apply the law of a state other than the forum], we apply Illinois law to the question whether the parties agreed to submit disputes to arbitration.").

state. *Smurfit Newsprint Corp. v. Southeast Paper Mfg. Co.,* 368 F.3d 944, 949 (7th Cir. 2004), citing *English Co. v. Northwest Envirocon, Inc.,* 278 Ill.App.3d 406, 215 Ill. Dec. 437, 663 N.E.2d 448, 452 (1996). However, Illinois may only apply a contract's choice-of-law clause if the contract itself is valid. *Kohler v. Leslie Hindman, Inc.,* 80 F.3d 1181, 1185 (7th Cir. 1996); *see also Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 199 Ill.2d 325, 264 Ill. Dec. 283, 770 N.E.2d 177, 194 (2002).

Snap's Terms of Service contain a choice-of-law provision for the law of California, but as discussed *infra*, the validity of the contract is at issue. As set out more fully below, there is no valid and/or enforceable contract between the parties. A contract's choice-of-law provision may not apply if contract's legality is fairly in doubt, for example, if the contract is unconscionable, or if there is some other issue as to the validity of the very formation of the contract. *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357 (7th Cir. 2015). Given that the contract is invalid—or at the very least, its legality is fairly in doubt—the court should not apply any choice of law provision therein. Illinois law must govern this dispute.

### III. Arbitrability

#### A. The Court, Not The Arbitrator, Must Decide Whether a Contract Exists

In support of its motion, Defendant states that any gateway questions regarding the validity of its arbitration agreement with Plaintiff are for the arbitrator to decide. However, the issue of a contract's existence cannot be delegated. Because Plaintiff asserts that no contract has been formed between the parties, the court may not order arbitration in this matter without first making a threshold determination of whether a contract does in fact exist, and this is the rule even when a valid delegation clause is found to exist

As the Seventh Circuit has observed, "The division of labor between courts and arbitrators is a perennial question in cases involving arbitration clauses." *Janiga v. Questar*

*Capital Corp.*, 615 F.3d 735, 741 (7th Cir. 2010). In *Granite Rock Co. v. International Brotherhood of Teamsters*, the Supreme Court preserved a distinction between disputes involving the initial formation of an arbitration agreement versus disputes concerning the agreement's enforceability or applicability (at least where the arbitration agreement contains a delegation clause). 561 U.S. 287, 299-300. (2010). Thereafter, applying the Court's reasoning in *Granite Rock Co.*, the Seventh Circuit held that "[T]he court must decide whether a contract exists before it decides whether to stay an action and order arbitration." *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010); See also *Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719, 726-28 (N.D. Ill. 2017) (reviewing impact of delegation clause on Court's ability to determine whether contract was formed and concluding that the Court, and not the arbitrator, makes that determination); *Gragg v. ITT Tech. Inst.*, No. CV 14-3315, 2016 WL 777883, at *4 (C.D. Ill. Feb. 29, 2016) (distinguishing among "(1) a challenge that is specific to the enforceability of the arbitration agreement within the contract; (2) a challenge to the validity of the whole contract; or (3) a claim that a contract was never formed," and holding that *Janiga* recognizes judicial responsibility for the latter).

### B.  The Arbitration Agreement Does Not Contain a Delegation Clause

When a contract's formation is undisputed, questions of arbitrability may be delegated to the arbitrator by virtue of a delegation clause, so long as the delegation is clear and unmistakable. No delegation clause exists here, and the court may not imply that such an agreement exists. "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944–45 (1995). Given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand

6

why courts might hesitate to interpret silence or ambiguity on the "who should decide arbitrability" point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide. *Id*.

Defendant points to the following statement as evidence of delegation: "[t]he arbitrator will decide the jurisdiction of the arbitrator and the rights and liabilities, if any, of you and Snap Inc." Mot. at 16; Reynolds Decl. Ex. 2 at 12. However, this vague language falls far short of what courts have held to constitute an unmistakable delegation of the gateway issue of arbitrability. By way of contrast, the Supreme Court found in *Rent-A-Ctr., W., Inc. v. Jackson,* that the following clause was a clear and unmistakable delegation clause:

> "The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable."

561 U.S. 63, 66 (2010). Numerous courts, including district courts sitting in the state of Illinois, have required similarly unmistakable and express evidence that the parties agreed to arbitrate arbitrability.[3]  Snap's language within the agreement wholly fails to reference interpretation, applicability, enforceability, or formation of the agreement as arbitrable issues.

The parties to an agreement are bound to arbitrate only those issues they have agreed to arbitrate, as shown by the clear language of the agreement and their intentions expressed in that

---

[3] *See Lee v. Uber Techs., Inc.*, 208 F. Supp. 3d 886, 891 (N.D. Ill. 2016); *See also Suarez v. Uber Techs., Inc.*, No. 8:16–CV–166–T–30MAP, 2016 WL 2348706, at *4 (M.D. Fla. May 4, 2016) (concluding that identical language in *Rasier* Agreement was clear and unmistakable evidence of intent to arbitrate arbitrability); *Varon v. Uber Techs., Inc.*, No. CV MJG–15–3650, 2016 WL 1752835, at *6 (D. Md. May 3, 2016) (same); *Sena v. Uber Techs. Inc.*, No. CV–15–02418–PHX–DLR, 2016 WL 1376445, at *3–4 (D. Ariz. Apr. 7, 2016) (same).

language. *Rauh v. Rockford Products Corp.,* 143 Ill.2d 377, 387, 158 Ill. Dec. 523, 574 N.E.2d 636 (1991); *Flood v. Country Mut. Ins. Co.,* 41 Ill.2d 91, 94, 242 N.E.2d 149 (1968). An arbitration agreement will not be extended by construction or implication. *Flood,* 41 Ill.2d at 94, 242 N.E.2d 149. In this manner, the law treats silence or ambiguity about the question "*who* (primarily) should decide arbitrability" differently from the way it treats silence or ambiguity about the question "*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement." *Salsitz v. Kreiss*, 198 Ill.2d 1, 15, 761 N.E.2d 724, 732 (2001), *as supplemented on denial of reh'g* (Dec. 3, 2001). Absent clear and unmistakable evidence of an intent to delegate questions of arbitrability to the arbitrator, the court must determine whether Plaintiff's claims must be submitted to arbitration.

Moreover, Defendant's purported delegation clause is located inconspicuously in the fifth paragraph of the agreement. It does not appear in the agreement's first paragraph, which has the heading "Applicability of Arbitration Agreement" and specifically addresses the scope and applicability of the agreement. Logically, the delegation clause should be included in the section discussing the very issue(s) the arbitrator is supposed to decide, and the fact that it is not in that section casts further doubt that the parties had unmistakably intended the arbitrator to decide issues of applicability.

### IV. Plaintiff Disaffirmed Any Contract with Defendant

In evaluating the validity of an arbitration agreement, the Court must apply Illinois state law—specifically, its general contract doctrines. *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 711 (7th Cir. 2019). ("When, as here, a 'case concerns the application of the Federal Arbitration Act,' the Illinois Supreme Court has 'base[d] [its] analysis upon principles of fundamental contract law' to determine the formation of an agreement." *quoting Melena v.*

8

*Anheuser-Busch, Inc.*, 219 Ill.2d 135, 301 Ill. Dec. 440, 847 N.E.2d 99, 103, 107 (2006)). Minors are afforded special protections with regard to contracts in the state of Illinois, and the public policy is to protect them and their property from the consequences of dealing with others. As such, the courts of this state have consistently and assiduously guarded the rights of minors. See *Swiney v. Womack*, 343 Ill. 278, 287–88, 175 N.E. 419 (1931); *Zozaski v. Mather Stock Car Co.*, 312 Ill. App. 585, 590, 38 N.E.2d 825 (1942).

Under Illinois' infancy doctrine, the general rule applicable to all contracts, other than for necessaries, is that the contract of a minor is voidable and may be repudiated by the minor during minority or within a reasonable time upon achieving majority absent a ratification. *Shepherd v. Shepherd*, 408 Ill. 364, 375, 97 N.E.2d 273 (1951); *Hunter v. Egolf Motor Co.* (1932), 268 Ill. App. 1 (1932). "The exercise of a minor's right to disaffirm his contract may operate injuriously and sometimes unjustly against the other party, but the right exists for the protection of the infant against his own improvidence and may be exercised entirely in his discretion." *Hunter v. Egolf Motor Co.*, 268 Ill. App. at 6. The ignorance of one party to the contract of the minority of the other party is, generally, of no consequence and does not operate as a bar to the right of the minor to disaffirm. *Wieland v. Kobick*, 110 Ill. 16, 18 (1884). The right to disaffirm applies whether the contract is wholly executory or fully executed and, if the consideration is lost or expended, the minor is not bound to make restitution. *Collins v. Peters Real Estate Improvement Corp.* (1929), 252 Ill. App. 348, 350 (1929); *Shellabarger v. Jacobs*, 316 Ill. App. 191, 196, 45 N.E.2d 184 (1942).

The exceptions to the infancy doctrine are exceedingly narrow, generally extending to highly specific types of contracts, such as those for necessaries. Defendant argues that Plaintiff may not disaffirm her contract in this case because, under Illinois law, a minor cannot accept the

9

benefits of a contract and then later disavow the contract that conferred the benefit in an attempt to avoid arbitration.[4] Defendant cites *Sheller by Sheller v. Franl's Nursery & Crafts* in support of its argument, but its reliance is misplaced, as *Sheller* is easily distinguished on the facts. 957 F. Supp. 150 (N.D. Ill. 1997).

In *Sheller*, a case of first impression relied on by Defendant, the court considered whether minors may disaffirm employment contracts. Most jurisdictions have held that employment contracts are not voidable by minors. Courts have offered various rationales, including the argument that employers would be unlikely to hire minors if their employment contracts were voidable.[5] In *Sheller*, the minor plaintiffs brought a Title VII action arising out of their employment. *Id.* at 152. The minor plaintiffs' employment was governed by an employment agreement, which contained an arbitration clause. *Id.* at 153. When the defendant moved to compel arbitration, the plaintiffs argued that the employment contracts were void based on their minority. *Id*. The instant case does not involve an employment contract, and the court's reasoning in *Sheller* cannot – and should not – be extended to consumer contracts like the one at issue here. Doing so would invalidate the infancy doctrine altogether. *Sheller* relied on the policy rationale that the infancy doctrine "'is to be used as a shield and not as a sword.'" *Id.* (quoting *Shepherd,* 97 N.E.2d at 282). However, this limitation is inapplicable to the instant case, given that Plaintiff is not using

---

[4] Defendant states that the benefit of the contract was "using the Snapchat application." If this is true, then Plaintiff did not retain any benefit from her contract once she discontinued her use of the app.

[5] *See Spicer v. Earl*, 41 Mich. 191, 194, 1 N.W. 923, 924 (1879)("Prudent men would not give employment under such circumstances…").

her minority as a sword to injure Defendant.[6] Here, the **only** issue impacted by Plaintiff's use of the infancy doctrine is the appropriate forum to adjudicate her claims.

*Sheller* notes that the infancy doctrine exists to protect the inexperienced minors in their dealings with others. 957 F. Supp. at 153. Applying this policy, the court reasoned that the plaintiffs' status as "minors was irrelevant to their signing of the employment application agreeing to arbitrate all claims against the company. Indeed, Defendant required all of its employees, including adults, to sign the same agreement." *Id.* But the infancy doctrine is not premised on the relevance of the child's status as a minor to the agreement in question, or the existence of separate agreements for adults and minors. Moreover, this line of reasoning in *Sheller* implies that the infancy doctrine requires an element of discrimination against minors specifically, which it does not. The infancy doctrine is premised on the commonsense principle that children are not competent to enter into binding legal agreements, and this rationale is fully implicated here by Snap's argument that an eleven year-old girl could have contracted to waive her constitutional rights. Moreover if *Sheller's* reasoning that the infancy doctrine requires different agreements for minors and adults was the law, it would eviscerate the infancy doctrine altogether because few, if any, companies have different agreements for minors and adults. Accordingly, we respectfully suggests that *Sheller* was wrongly decided, and/or should be limited in application to its particular facts,

*Sheller* further reasoned that "the minor is not entitled to retain an advantage from a transaction which he repudiates." 957 F. Supp. at 153 (quotation and citation omitted). But

---

[6] It is worth noting that courts still routinely invalidate minors' contracts where the other party has been financially injured. The mere fact that injury results from a minor's disaffirmance is not determinative as to whether the infancy doctrine is applicable. *See Wieland v. Kobick*, 110 Ill. 16, 18 (1884). In other words, the infancy doctrine may still cause harm, but such harm is outweighed by the public policy of protecting minors and their property.

Plaintiff has not retained any advantage or benefits from Snap.[7] While Defendant has latched onto this principle as a basis to compel arbitration in this case, the *Sheller* court's rationale actually stems from the principle that a minor cannot both disaffirm a contract and sue on that same contract. *See, e.g.,* 7 Joseph M. Perillo, CORBIN ON CONTRACTS § 27.4 (Rev. Ed.2002). This further distinguishes *Sheller* from the instant case. Here, Plaintiff is not suing Defendant in connection with a contract or raising any breach of contract claims. Rather, she is exclusively suing Defendant for violations of BIPA.

Illinois' infancy doctrine is well-established; it derives from common law and exists in similar form in every other jurisdiction. . *See Stroupes v. Finish Line, Inc.,* No. 1:04-CV-133, 2005 WL 5610231, at *5 (E.D. Tenn. Mar. 16, 2005)(discussing *Sheller*). There is also no Illinois precedent suggesting a minor may not invalidate an agreement simply because it contains an arbitration clause. In fact, many other courts have held that a minor is **not** bound by an arbitration clause under similar circumstances. *See H & S Homes, L.L.C. v. McDonald,* 823 So.2d 627, 630 (Ala. 2001) (holding that "infancy is a valid defense to the enforcement of a properly supported motion to compel arbitration of disputes arising out of a contract"); *Wilkie v. Hoke,* 609 F.Supp. 241, 243 (W.D.N.C. 1985) (denying defendant's motion to compel arbitration because the minor plaintiff was not bound by the arbitration provision); *Dickson v. Hoffman,* 305 F.Supp. 1040, 1042 (D.C. Kan. 1969) (recognizing that the public policy of Kansas protects a minor's right to disaffirm an arbitration provision in a contract); *cf. Millsaps v. Estes,* 137 N.C. 535, 50 S.E. 227, 228 (1905) (holding that an agreement by an attorney on behalf of a minor to submit to arbitration is voidable by the minor). In sum, there is no reason to apply *Sheller* beyond its specific facts.

---

[7] In fact, Plaintiff's use of the app was to her *detriment* – as opposed to her benefit – since her use enabled Defendant to collect, capture, and/or receive her personal biometric information in violation of BIPA.

Defendant argues that even if its contract with Plaintiff is voidable, Plaintiff did not effectively disaffirm it. Disaffirmance or renunciation is a question of intent, and need not take any specific form in order to be effective. *Logan Cty. Bank v. Taylor*, 11 Ill. App. 3d 120, 121, 295 N.E.2d 743, 744 (1973) ("[T]o impose specificity and formality on the act of disaffirmance is to disregard the basis for the policy of the law that protects minors from their improvident actions and which accords to them the right to disaffirm."). As a general rule, a minor's contract may be avoided by any act showing unequivocally a renunciation of, or a disposition not to abide or be bound by, the contract made during minority. *Id.* (quoting 27 I.L.P. Minors, Sec. 43, p. 39). Plaintiff, through her guardian, disaffirmed her contract when she discontinued using the app in November 2020, removed it from her phone, and stated in the Complaint that "Plaintiff hereby disaffirms and disavows any contract or agreement Snap may say applies". Compl., at ¶ 7. Per the Terms unilaterally drafted by Defendant, Plaintiff could "terminate these Terms at any time and for any reason by deleting [her] account." ECF No. 26, Reynolds Decl., Exhibit 5 at ¶ 13. There could be no remaining doubt as to her intent when, while still a minor, she filed this putative class action, in which she specifically disavowed any contract or agreement with Defendant. *See A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1062 (7th Cir. 2018) ("A.D. certainly engaged in an act of disaffirmation by filing this lawsuit and asserting her status as a minor.")

Defendant alleges that Plaintiff's Snapchat account was active on January 22, 2021 for approximately 6 minutes, thereby invalidating any disaffirmance of the contract. ECF No. 26, Reynolds Decl. at ¶ 8. Defendant cites to *E.K.D. ex rel. Dawes v. Facebook, Inc.* in support of its argument. Immaterial to the instant proceedings, in *E.K.D. ex rel. Dawes*, the court was specifically applying California law to a dispute regarding the validity of a forum selection clause in Facebook's terms of service. 885 F. Supp. 2d 894, 898 (S.D. Ill. 2012). Not only is California law

inapplicable to this case, but *E.K.D. ex rel. Dawes* is also distinguishable on its facts. In that case, the minor plaintiff's use of Facebook was unabated after filing his suit, he never stopped using the Facebook app., and he offered no evidence for his disaffirmance of the contract beyond the mere fact of his minority. *Id*. The court found that, because he had not altered his use of the application in any way, and was still enjoying the benefits of using it, it would be inequitable for him to disaffirm only the forum selection clause without disaffirming the contract as a whole. *Id*. at 899. ("[M]inors, if they would disaffirm a contract, must disaffirm the entire contract, not just the irksome portions.").

Plaintiff in this case *did* disaffirm the contract as a whole. Plaintiff deleted the Snapchat app from her phone and has not attempted to access it since filing this action in November 2020. This act is sufficient under the Terms to terminate any contract between the parties. *See* ECF No. 26, Reynolds Decl., Exhibit 5 at ¶ 13. Defendant also collects identifiers associated with cookies and other technologies to uniquely identify a user's device or browser,[8] so Defendant is also keenly aware that this brief and singular activity did not originate from Plaintiff's phone.

Furthermore, the average Snapchat user spends nearly *30 minutes per day* on the app.[9] By way of comparison, since the filing of her complaint, Plaintiff's account has been active a mere 0.02% of the time of an average user during the same time period. Any activity is clearly *de minimus* and does not invalidate Plaintiff's disaffirmance. Importantly, Defendant has control of Plaintiff's account, including the ability to deactivate it. Despite being served with Plaintiff's Class Action Complaint, and being told expressly that Plaintiff is a minor, Defendant elected to keep Plaintiff's account active and accessible.

---

[8] https://snap.com/en-US/terms (last visited Mar. 4, 2021).
[9] https://time.com/4272935/snapchat-users-usage-time-app-advertising/ (last visited Mar. 4, 2021).

### V. Any Purported Contract Is Unenforceable as a Matter of Public Policy

In determining the existence of an agreement to arbitrate, federal courts apply state-law principles of contract formation. *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 711 (7th Cir. 2019). An enforceable contract in Illinois requires "an offer, acceptance, consideration, and mutual assent." *Nat'l Prod. Workers Union Ins. Tr. v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011). Like other contracts, however, they may be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687 (1996). States may regulate contracts, including arbitration clauses, under general contract law principles, and they may invalidate an arbitration clause "upon such grounds as exist at law or in equity for the revocation of *any* contract." *Id.* at 686.

Even if the court were to find that a valid contract existed between the parties, such contract would still be unenforceable as a matter of public policy. Illinois has a strong public policy "that the rights of minors be guarded carefully." *Villalobos v. Cicero Sch. Dist. 99*, 362 Ill.App.3d 704, 298 Ill. Dec. 944, 841 N.E.2d 87, 93 (2005)*; see also Goesel v. Boley Int'l (H.K.) Ltd.*, 806 F.3d 414, 422 (7th Cir. 2015); *Mastroianni v. Curtis*, 78 Ill. App. 3d, 97, 100, 33 Ill. Dec. 723, 397 N.E.2d at 58 (1979); *Ott v. Little Company of Mary Hospital,* 273 Ill. App. 3d 563, 570, 210 Ill. Dec. 75, 652 N.E.2d 1051, 1056 (1995). Specifically, Illinois has a strong public policy protecting the rights of minors in contract. *Hunter v. Egolf Motor Co.*, 268 Ill.App. at 6. ("The exercise of a minor's right to disaffirm his contract may operate injuriously and sometimes unjustly against the other party, but the right exists for the protection of the infant against his own improvidence and may be exercised entirely in his discretion.") This public policy is at the heart of the infancy doctrine, discussed *supra.*

At the time Plaintiff first created her Snapchat account in January 2019, she was 11 yearsold. Although Defendant claims its app is only for those over the age of 13, Snap was keenly

aware as early as 2014 that its app was being used regularly by children under the age of 13. While usage by young children is not *per se* illegal, apps and other online services which collect personal information from children under the age of 13 are subject to heightened requirements under the Children's Online Privacy Protection Act ("COPPA"). 15 U.S. Code § 6501. Congress' intent in passing COPPA was to increase parental involvement in children's online activities, ensure children's safety during their participation in online activities, and most importantly, protect children's personal information.

In 2014, Defendant entered into a 10-year settlement with the Attorney General for the state of Maryland in which it agreed to address the use of the app by young children by complying with COPPA and taking specific steps to ensure that the app wasn't being used by children under 13. (See Exhibit 1) Clearly, Defendant has failed to take any reasonable measures to screen, prevent, and/or protect underage users. Young children, such as Plaintiff, can easily bypass any purported "age requirements" and create an account by simply fabricating their birth year during the sign-up process. No additional verification is required during the sign-up process, despite Defendant's actual knowledge that children under 13 are regularly creating accounts, in violation of its settlement agreement with the Maryland Attorney General. Even if a user is discovered to be under 13, Defendant has no policy for removing his/her account.[10]

Despite Defendant's actual knowledge that many of its users are under age 13, it has every incentive to turn a blind eye in order to drive its own financial growth. Defendant derives nearly

---

[10] In contrast, Facebook removes any accounts created by children under 13 and uses cookies to ensure that the underage user does not attempt to sign up again.

all of its revenue from advertising, which depends on both users and their data. Snap made the

following statement in its 2019 Annual Report[11]:

> "[Snapchat] rel[ies] heavily on our ability to collect and disclose
> data and metrics to and for our advertisers to attract new advertisers
> and retain existing advertisers. Any restriction, whether by law,
> regulation, policy, or other reason, on our ability to collect and
> disclose data and metrics which our advertisers find useful would
> impede our ability to attract and retain advertisers. For example, the
> General Data Protection Regulation, or GDPR, in the European
> Union, which went into effect in May 2018, expanded the rights of
> individuals to control how their personal data is collected and
> processed, and placed restrictions on the use of personal data of
> **younger minors**…Such restrictions could have an adverse effect on
> our ability to target and measure ads, and could reduce the demand
> or the pricing for our advertising products. Such adverse effects
> could be particularly material to us because we are still early in
> building our advertising business." (emphasis added)

Plainly, Defendant profits from users under the age of 13, including Plaintiff, by procuring their

data and disclosing it to advertisers, in direct contravention of COPPA and BIPA. Defendant now

attempts to take advantage of its own misconduct by attempting to enforce agreements obtained as

a direct result of its own bad faith and violative behavior.

In deciding whether an agreement violates public policy, we must "'determine whether the

agreement is so capable of producing harm that its enforcement would be contrary to the public

interest.'" *Feinberg v. Feinberg (In re Estate of Feinberg),* 235 Ill.2d 256, 265–66, 335 Ill. Dec.

863, 919 N.E.2d 888 (2009) (quoting *Kleinwort Benson North America, Inc. v. Quantum Financial*

*Services, Inc.,* 181 Ill.2d 214, 226, 229 Ill. Dec. 496, 692 N.E.2d 269 (1998)). Minors are afforded

special protections with regard to contracts in the state of Illinois, and the public policy is to

protect them and their property from the consequences of dealing with others. *See Swiney v.*

*Womack*, 343 Ill. 278, 287–88, 175 N.E. 419 (1931). Enforcing arbitration agreements against

---

[11]   https://s25.q4cdn.com/442043304/files/annual/2019-annual-report.pdf   (last   visited   Mar.   4,
2021).

children as young as 11 would directly violate Illinois' public policy, which affords special protections to minors in their contracts with others. Section 178 of the Restatement (Second) of Contracts (1981) states that, in determining whether a contract term is void as a matter of public policy, the court may also look at the seriousness of any misconduct involved and the extent to which it was deliberate, and the directness of the connection between that misconduct and the term. There is no question that any agreement that Defendant purportedly procured with Plaintiff was the result of Defendant's own misconduct.

Defendant should be further barred from enforcing the arbitration agreement under the doctrine of unclean hands. It is a basic maxim of equity that he who seeks equity must do equity. *Long v. Kemper Life Insurance Co.,* 196 Ill.App.3d 216, 218, 142 Ill. Dec. 925, 553 N.E.2d 439 (1990). The doctrine of unclean hands precludes a party from taking advantage of his own wrong. *Long,* 196 Ill.App.3d at 219, 142 Ill. Dec. 925, 553 N.E.2d 439, citing *State Bank of Geneva v. Sorenson,* 167 Ill.App.3d 674, 680, 118 Ill. Dec. 305, 521 N.E.2d 587 (1988). It is an equitable doctrine that bars relief when the party seeking that relief is guilty of misconduct in connection with the subject matter of the litigation. *Thomson Learning, Inc. v. Olympia Properties, LLC,* 365 Ill.App.3d 621, 634, 302 Ill. Dec. 877, 850 N.E.2d 314 (2006), citing *Wolfram Partnership, Ltd. v. LaSalle National Bank,* 328 Ill.App.3d 207, 221–22, 262 Ill. Dec. 404, 765 N.E.2d 1012 (2001). For the doctrine to apply, the party's misconduct must rise to the level of fraud or bad faith. *Thomson Learning, Inc.,* 365 Ill.App.3d at 634, 302 Ill. Dec. 877, 850 N.E.2d 314, citing *Beitner v. Marzahl,* 354 Ill.App.3d 142, 150, 289 Ill. Dec. 466, 819 N.E.2d 1266 (2004). To determine whether a party acted with unclean hands, the court must look to the intent of that party. *Thomson Learning, Inc.,* 365 Ill.App.3d at 634, 302 Ill. Dec. 877, 850 N.E.2d 314, citing *Schivarelli v. Chicago Transit Authority,* 355 Ill.App.3d 93, 103, 291 Ill. Dec. 148, 823

N.E.2d 158 (2005). There is no question that the unclean hands doctrine is applicable here. But for Defendant's bad faith in connection with allowing minors, such as Plaintiff, to sign up for and regularly utilize the app, Plaintiff could not be a party to the arbitration agreement that Defendant is attempting to enforce. Defendant compounded the inequity by allowing a known minor who has sued it to log into an account that Defendant easily could have blocked. Defendant's position is untenable and unjust, and Defendant should not reap any benefit from its failure to prevent minors from accessing its app.

## **CONCLUSION**

For all the reasons set forth herein, Plaintiff respectfully requests that the court DENY Defendant's Motion to Compel Arbitration.

Dated: March 5, 2021                          Respectfully Submitted,

**THE DRISCOLL FIRM, LLC**

By:    */s/ John J. Driscoll*
        John J. Driscoll, #6276464
        1311 Avenida Juan Ponce de Leon6th Floor
        San Juan, PR 00907
        Phone: (618) 444-6049
        Fax: (314) 932-3233
        john@jjlegal.com

**MILBERG PHILLIPS GROSSMAN LLP**

Andrei Rado
Blake Hunter Yagman
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Telephone: (212) 594-5300
arado@milberg.com
byagman@milberg.com

**WHITFIELD BRYSON & MASON LLP**

Matthew Lee
Erin Ruben
900 W. Morgan Street
Raleigh, NC 27605
Telephone: (919) 600-5000
matt@whitfieldbryson.com
erin@whitfieldbryson.com

**GREG COLEMAN LAW PC**

Gregory F. Coleman
Jonathan B. Cohen
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
greg@gregcolemanlaw.com
jonathan@gregcolemanlaw.com

*Attorneys for Plaintiff and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 5, 2021, the foregoing document was electronically filed with the Clerk of Court to be served by operation of the Court's CM/ECF system upon all counsel of record.

<em>/s/ John J. Driscoll</em>