```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2

 3                                      )
        K.F.C., A MINOR, BY AND         )
 4      THROUGH HER GUARDIAN, ERIN      )
        CLARK,                          )
 5                                      ) Case No.
                     Plaintiff,         ) 3:21-cv-00009-DWD
 6                                      )
                     vs.                )
 7                                      )
        SNAP INC.,                      )
 8                                      )
                     Defendant.         )
 9

10

11

12

13                          MOTION HEARING

14

15
        BE IT REMEMBERED AND CERTIFIED that heretofore on the 3rd day
16    of May, 2021, HONORABLE DAVID W. DUGAN, United States District
      Judge, presiding, the following proceedings were recorded by
17      mechanical stenography; transcript produced by computer.

18

19

20

21

22                      Karen E. Waugh, CSR, RPR, CRR
23                        IL CSR #084-003688
                            750 Missouri Avenue
24                      East St. Louis, IL  62201
                            618-482-9176
25                    karen_waugh@ilsd.uscourts.gov
```

```
 1                              APPEARANCES

 2

 3   FOR PLAINTIFF:        DRISCOLL FIRM, LLC
                           1311 Avenida Juan Ponce de Leon
 4                         6th Floor
                           San Juan, PR  00907
 5                         By John J. Driscoll

 6                         MILBERG COLEMAN BRYSON PHILLIPS
                           GROSSMAN, PLLC
 7                         900 West Morgan Street
                           Raleigh, NC  27603
 8                         By Ms. Erin J. Ruben
                           By Mr. Matthew E. Lee
 9

10
     FOR DEFENDANT:        MORGAN, LEWIS & BOCKIUS, LLP
11                         110 North Wacker Drive, Suite 2800
                           Chicago, IL  60606
12                         By Ms. Elizabeth B. Herrington

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Court convened at 9:58 a.m.)
 2             COURTROOM DEPUTY:  Case No. 21-cv-9, Erin Clark v.
 3   Snap Inc., is called for a motion hearing.  Will the parties
 4   please identify themselves for the record?
 5             MR. LEE:  Good morning, Your Honor.  Matthew Lee for
 6   the plaintiff.
 7             THE COURT:  Good morning.
 8             MR. DRISCOLL:  Good morning, Your Honor.  John
 9   Driscoll for the plaintiffs.
10             THE COURT:  Good morning.
11             MS. RUBEN:  Good morning, Your Honor.  Erin Ruben for
12   the plaintiffs.
13             THE COURT:  Good morning.
14             MS. HERRINGTON:  Good morning.  Beth Herrington on
15   behalf of defendant, Snap Inc.
16             THE COURT:  All right.  Good morning.  First of all,
17   I'll tell you that if you want to make an argument from your
18   seat, you may, with or without your mask.  It's up to you.  As
19   you'll notice, I'm not wearing one up here.  I'm going to
20   leave that up to you and your partners or those that are
21   nearby, all right?  If you're going to use the podium, pull it
22   back, obviously, and/or use a mask, all right?
23                So I understand we have a couple motions.  The one
24   that I think everyone probably will agree that should be
25   handled first would be the motion to compel arbitration.  That
```

```
 1   seems to be the one that causes the most grief in this case

 2   right at the moment.  So who's going to be arguing that?

 3            MS. HERRINGTON:  I will.

 4            THE COURT:  Okay.

 5            MS. HERRINGTON:  Is it okay if I come up to the

 6   podium?

 7            THE COURT:  Yeah.  If you're at the podium, you need

 8   to pull it back or wear a mask, just out of consideration for

 9   Karen.

10            MR. LEE:  Your Honor, if I may, just on the motions,

11   I think we had decided to stay the motion to dismiss and deal

12   with the motion to compel arbitration first.

13            THE COURT:  You had agreed to do that or --

14            MR. LEE:  That's right.  I think at the last status

15   conference we discussed it.

16            THE COURT:  I have no recollection of that, but I

17   take your word for it.

18            MR. LEE:  Okay.

19            THE COURT:  All right.  Good deal.  Go ahead,

20   Counsel.

21            MS. HERRINGTON:  Okay.  Good morning.  Thank you,

22   Your Honor.  As Your Honor may know, Snap is a technology

23   company that developed and operates the Snapchat smart phone

24   application, and it allows people to communicate through short

25   videos and images.  Snapchat includes the popular features
```

1  called lenses and filters, which allow users to edit photos

2  and video they share to include real-time specific effects and

3  sounds.  Importantly, for purposes of this case, Your Honor,

4  lenses and filters do not use facial recognition technology

5  that places these specific effects, so in other words, it uses

6  object recognition technology.  The technology allows a

7  face -- or nose to be identified as a nose and an eye

8  identified as an eye, but it can't identify a nose or an eye,

9  much less a specific face of a specific person, so it's object

10  technology as opposed to facial recognition technology.

11        But for purposes of our motion here, plaintiff is a

12  14-year-old minor who created her Snapchat account on

13  January 9th, 2019.  She appears to enjoy Snapchat very much.

14  She's a frequent user.  According to records before the Court,

15  she continued to use Snapchat for months after filing this

16  BIPA class action.  Even after Snap moved to compel

17  arbitration, she again continued to use the Snapchat app.  On

18  May -- February 14th, 2021, plaintiff opened Snapchat 28 times

19  and spent a total of 116 minutes on Snapchat.

20        The lawsuit that her guardian has filed on her

21  behalf, however, is severely misplaced, both on the merits,

22  which is for another day, and also on the forum, which is a

23  motion to compel arbitration.  This case should not be before

24  the Court.  It belongs in arbitration.

25        As we demonstrated with our declarations and our

1    exhibits that we submitted with our motion to compel, Snapchat

2    users like plaintiff expressly agree to Snap's terms of

3    service when they download Snapchat on a device and they

4    create a Snapchat account using the app and when users also

5    subsequently upgrade the app to get the latest technology, the

6    latest software for the technology.  To create a Snapchat

7    account, a user must first upload the app, open it and press

8    affirmatively a signup button.  The user is then presented

9    with a screen to enter their first and last name, and then

10   they must click sign up and accept, and on that screen, right

11   above the button that they must press, sign up and accept, is

12   the following statement:  By tapping sign up and accept, you

13   acknowledge that you have read the privacy policy and agree to

14   the terms of service.

15        Since September 15th, 2015, the terms of service, all

16   six versions that Snapchat has had, have all contained a

17   virtually identical arbitration agreement.  Now, Snap

18   sometimes updates the terms, and when it does so, existing

19   Snapchat users are given notice of and have to expressly

20   assent to the updated terms before they're allowed to upgrade

21   the Snapchat app on their phone.

22        Plaintiff has upgraded the app two other times since

23   she first signed out, on February 23rd, 2019, and then again

24   on October 25th, 2019.  Each time she did so, she agreed to by

25   clicking an accept button, accepting again the terms of

```
 1  service.  By agreeing to the terms on at least three different
 2  occasions, plaintiff agreed to the arbitration provision set
 3  forth clearly in the terms.  Those terms tell Snap users not
 4  once, but twice, that any claims or disputes against Snap must
 5  be brought in individual non-class arbitration.  The very
 6  first section of the terms -- they're attached as an exhibit
 7  to the declaration we submitted -- says:  Arbitration notice,
 8  these terms contain an arbitration clause; a little later on:
 9  Except for certain types of disputes mentioned in that
10  arbitration class, you and Snap Inc. agree that disputes
11  between us will be resolved by mandatory binding arbitration
12  and you and Snap Inc. waive any right to participate in a
13  class action lawsuit or class-wide arbitration.  Then there's
14  a hyperlink to the full arbitration clause in section 17 in
15  the terms which provides in part:  You and Snap Inc. agree
16  that all claims and disputes, whether contract, tort or
17  otherwise, including all statutory claims and disputes arising
18  out of or relating to these terms of the use of services that
19  cannot be resolved in small claims court, will be resolved by
20  binding arbitration on an individual basis; and that's
21  attached to several -- several examples, to the declaration we
22  submitted.
23          As Your Honor knows -- I know you've had a recent
24  case involving a motion to compel arbitration that you had
25  mentioned on our last status conference -- the FAA does
```

1   reflect a very liberal policy favoring arbitration and

2   requires that arbitration agreements be rigorously enforced.

3   Here the parties' arbitration agreement is governed by the

4   FAA, and because plaintiff's claims fall within the scope of

5   the arbitration agreement, plaintiff is bound to its

6   provisions requiring resolution of her claims by binding

7   arbitration, delegating threshold arbitrability issues,

8   however, to the arbitrator and waiving any right to class

9   action proceedings, which she asserted in this case.

10          Really, Your Honor, the only question for the Court

11   to decide this morning is did the parties enter a binding

12   contract that contains an arbitration provision, and the

13   answer is yes, most definitely, and in fact, reviewing the

14   papers, plaintiff does not argue otherwise.  There was a

15   contract here that was formed.  Courts around the country have

16   recognized that an electronic click, exactly what the

17   plaintiff did here, is sufficient to signify the acceptance of

18   a contract, and there's nothing offensive about such

19   agreements as long as the layout and the language of the site

20   gives the user reasonable notice that the click, by pressing

21   on the button, will manifest assent to an agreement.  That is

22   exactly how Snap's terms work.

23          Because the Snapchat app contains a very clear and

24   conspicuous statement that in order to sign up for the app, a

25   user must read the privacy policy and agree to the terms of

1   service by clicking the link or pressing the button, a

2   reasonable user who completes the process would understand

3   that he or she has manifested the assent to the Snap terms.

4   The contract between Snap and the plaintiff is binding.  By

5   agreeing to the terms no less than three different times,

6   plaintiff agreed to the arbitration provision set forth in

7   those terms.  The existence of an arbitration agreement within

8   the terms was clear and reasonably conspicuous to plaintiff

9   each time she accepted the terms, so she's bound to arbitrate

10  her claims in this case with Snap.

11          Now, once the Court has found that there is a binding

12  valid contract which contains the arbitration provision, then

13  the Court should order the plaintiff to abide by the terms and

14  arbitrate her claims on an individual basis.  Looking at the

15  arbitration agreement, it is clear that the arbitration

16  agreement scope covers the claims in this case.  Snap's

17  arbitration provision covers, quote, all claims and disputes,

18  whether contract, tort or otherwise, including statutory

19  claims and disputes arising out of or relating to the terms of

20  the use of the services.  The Seventh Circuit has reviewed

21  this similar type of provision and observed that an

22  arbitration agreement that requires arbitration of any claim

23  or dispute could be -- it would be hard to draft a broader

24  arbitration clause, but -- and this is important -- whether

25  plaintiff's claims fall within the scope of the arbitration

1   agreement is actually an issue for the arbitrator to decide.

2   The Supreme Court has held that when a party's contract

3   delegates the arbitrability question to an arbitrator, then

4   the Court should respect the party's decision as embodied in

5   the contract.

6        The terms here, the arbitration provision

7   specifically states the arbitrator will decide the

8   jurisdiction of the arbitrator and the rights and liabilities,

9   if any, of you and Snap.  The terms also incorporate the AAA

10  consumer arbitration rules, which are hyperlinked to the

11  terms -- in the terms.  Those rules provide that the

12  arbitrator shall have the power to rule on his or her own

13  jurisdiction, including any objections with respect to the

14  existence, scope or validity of the arbitration agreement or

15  to the arbitrability of any claims or counterclaims, and

16  that's in Rule 14 of the AAA consumer rules.  There are recent

17  cases that make clear that the incorporation of the AAA

18  consumer arbitration rules make it very clear that in fact

19  every court -- circuit court that has considered the issue has

20  determined that the incorporation of the AAA's arbitration

21  rule constitutes clear and unmistakable evidence that the

22  parties agreed to arbitrate arbitrability.

23        So we come to plaintiff's argument here.  Plaintiff

24  doesn't argue that the parties don't have -- didn't have --

25  didn't enter into a binding contract.  That is not their

1    argument, or even that it is an unconscionable contract.

2    Rather, she argues instead that she disavowed her agreement to

3    arbitrate, but there's at least three reasons, Your Honor,

4    that the plaintiff cannot now disavow her agreement to

5    arbitrate her dispute with Snap on an individual basis.

6    First, as I mentioned, the parties agreed to delegate

7    threshold issues regarding arbitrability to the arbitrator in

8    the first instance.  The deligation principle applies where,

9    as here, a plaintiff attempts to void an arbitration agreement

10   that was entered into based on her status as a minor.  We in

11   fact cited a case from the Central District of Illinois in a

12   BIPA class action, very similar type of factual scenario as

13   here, called the *Kuznik v. Hooters of America* case.  There was

14   a contract that was entered into with a delegation clause

15   there that -- the rules were JAMS as opposed to AAA, but the

16   Court went on to site cases that talked about incorporating

17   the AAA rules, and there, exactly the same.  The plaintiff

18   argued because of her status as a minor that she had disavowed

19   the contract and could stay in court.  The court disagreed and

20   said that that's an arbitration issue, that's an arbitrability

21   issue, and that if in fact she was found to disavow a

22   contract, that would be a decision for the arbitrator to make

23   as opposed to the court.

24           So here the deligation provision very clearly places

25   that decision on whether she actually did in fact -- and we

1    disagree with that, but whether she did in fact disavow her

2    arbitration agreement, that needs to be decided by the AAA

3    arbitrator.

4        THE COURT:  Is there anything that I have to decide

5    other than the motion to compel?

6        MS. HERRINGTON:  Other than the motion to compel

7    today, that's the only motion --

8        THE COURT:  But you removed it to me strictly for

9    that purpose.

10       MS. HERRINGTON:  Yes, yes.  Secondly, though, even if

11   plaintiff allegedly disavowed the terms and that was something

12   that the court found that Your Honor should decide, plaintiff

13   would still be required to arbitrate her claims.  Under both

14   Illinois and California law, whichever is applied, a minor

15   cannot accept the benefit of a contract, here using the

16   Snapchat app free of charge, but then later decide to disavow

17   the contract that conferred that benefit that she got.

18       THE COURT:  Is there any dispute as to the proper law

19   to apply, whether it's Illinois or California?

20       MS. HERRINGTON:  Well, Your Honor, as far as contract

21   formation, since that we're in here on CAFA and diversity, I

22   believe that Illinois would apply as -- in order to determine

23   whether there was actually a contract that was entered into,

24   but then the contract, the terms of use specify -- the terms

25   of service specify California law should apply to its terms,

1    but as we cited throughout our papers, it doesn't really

2    matter whether Illinois law or California law is applied to

3    interpreting the contract.  The result is exactly the same,

4    so --

5              THE COURT:  That's what I needed to hear.

6              MS. HERRINGTON:  Yeah.  And third, plaintiff also, as

7    this disavowal, she claims that she ceased using Snapchat

8    prior to the filing of this complaint, but as the evidence

9    before Your Honor shows, that is simply not so.  A minor

10   cannot disavow a contract while simultaneously enjoying the

11   benefit provided by the contract.  There was a case in the

12   Southern District called *E.K.D. v. Facebook* in the Southern

13   District of Illinois -- I believe it was before Judge Murphy

14   at the time -- and a similar type of situation where the

15   plaintiff there had continued to use Facebook and then tried

16   to disavow the terms of use which required her to bring her

17   case in California as opposed to Illinois.  There the court

18   found very, very clearly that a plaintiff cannot

19   simultaneously continue using and enjoying the benefit of a

20   contract while trying to distance themselves from the actual

21   binding provisions, including an arbitration agreement.

22             So we believe, Your Honor, one, that there is no

23   dispute that there is a contract here that was formed.  After

24   Your Honor would find that, the next step would be to order

25   the case to go to arbitration, dismissing this case.  If Your

1    Honor, though, is inclined to review the argument of

2    arbitrability -- that is, the disavowal -- we believe that

3    very clearly the case law supports our position that still the

4    plaintiff may not here disavow her arbitration agreement after

5    she has enjoyed the benefit of using Snap free of charge for

6    several years, and in fact, as the evidence shows, has

7    continued to use it even after Snap moved to compel

8    arbitration, and for those reasons, Your Honor, we would ask

9    that Your Honor dismiss this case in favor of arbitration --

10   individual arbitration with the AAA.

11          THE COURT:  Before you step away, I understand the

12   plaintiffs argued, I think, the central issue would be the

13   infancy doctrine in Illinois.

14          MS. HERRINGTON:  Sure.

15          THE COURT:  So you didn't touch on that with any

16   great depth.  That, again, I think is the central issue in

17   this, and assuming Illinois law applies, and I think it

18   probably does.

19          MS. HERRINGTON:  Right.

20          THE COURT:  I don't think there's a dispute from

21   anyone that it does apply.  So as to the infancy doctrine and

22   disavowing, I have not read Judge Murphy's decision, and I

23   will, but it occurs to me that the problem you have might be

24   the infancy doctrine, and that is that Snapchat is knowingly,

25   I think, involved in contracting with minors throughout the

1   country in the presentation of their product, for lack of a

2   better term, and they're knowingly doing this, and then but

3   you're saying you can't disavow it, right?  You're saying that

4   the plaintiff cannot disavow it even if she didn't go back to

5   using the platform; is that true?

6           MS. HERRINGTON:  Well, I believe that as far as

7   Illinois law, Your Honor, that we cited a Northern District of

8   Illinois case.  It's called *Sheller by Sheller v. Frank's*

9   *Nursery & Crafts, Inc.*  There -- Under the infancy doctrine,

10  as Your Honor knows, the -- minors can enter into contracts.

11  It's just a matter of whether then the infancy doctrine allows

12  them after the age of majority to disavow or void those

13  contracts.  Here there was no -- there's no problem as far as

14  the infancy doctrine of entering into the contract -- it's

15  very clearly that she did -- but whether she can void it.  The

16  case *Sheller v. Frank's Nursery & Crafts* applies Illinois law

17  and looks at -- it looks at this voidness issue after the

18  plaintiff has taken advantage of a certain contract.  Whether

19  or not it is appropriate for then her to be able to disavow or

20  step away when she doesn't like the provision, it was in the

21  arbitration provision.  She doesn't like that so she wants to

22  step away from the contract once the argument has been raised

23  that she needs to arbitrate her claims.  There too it was a --

24  Title 7 claims and sexual harassment claims that were brought.

25  These infants or minors had entered into an employment

1    contract, and it discusses under Illinois law that there

2    are -- that the privilege of minority may not be used as a

3    shield -- is to be used as a shield and not as a sword, which

4    is exactly what the plaintiff is trying to do here.  She has

5    used Snapchat for years.  It's only when now she would like to

6    use it to get out of the arbitration agreement that she's

7    using it as a sword.

8            In that case, it says that after disaffirmance, the

9    infant is not entitled to be put in a position superior to

10   such as one that he would not have occupied if he had never

11   entered into the voidable agreement.  So in other words, a

12   minor's not entitled to retain an advantage from a transaction

13   that he then goes on to later repudiate.  So in that case the

14   court said, no, you applied for -- to work, you did work,

15   there was an arbitration agreement in the application that you

16   specifically agreed to when we hired you; you can't now after

17   the fact, now that we have raised this arbitration agreement

18   in that contract, say, well, you know, now I'm going to

19   disavow it.  So we think that *Sheller* is on point to Your

20   Honor's question as far as whether once you have taken

21   advantage of or received the benefit of a contract, whether

22   then the minor may disavow it when there's a provision they

23   don't like such as an arbitration agreement.  It's exactly

24   what's happening here.

25           THE COURT:  Thank you.

1          MS. HERRINGTON:  Thank you.

2          MR. LEE:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. LEE:  Well, Your Honor, I think you are -- you

5   were dead on that this really does turn on the infancy

6   doctrine, and this case is really about whether parents can

7   protect their children from Silicon Valley, whether they have

8   that ability under the law, or whether a little girl in

9   Illinois can give up fundamental rights -- her fundamental

10  rights under the constitution of the United States without her

11  mother even knowing what she's done, because that's the

12  situation here.  They're arguing that this child, this

13  11-year-old child, gave up her fundamental right to a jury

14  trial.

15          So this motion really does turn on contract

16  formation.  Respectfully disagree.  We have certainly argued

17  that a contract was not formed in this case.  A contract was

18  not formed, and the real question is whether there's an

19  agreement at all.  The answer's no for at least three reasons.

20  The first, these circumstances fail the basic requirements for

21  forming a contract, and we'll take us back to law school for

22  just a second.  We need offer and we need acceptance and we

23  need consideration.

24          Here, one thing that really strikes me about these

25  terms of service, if Your Honor would flip to -- I think it's

1   the second exhibit -- this is docket entry 26-3 -- these are

2   the Snapchat terms of service that the defendants argue

3   applied when this child opened her Snapchat from September 26,

4   2017.  You can see on page 2, you know, these are the terms of

5   service.  It says welcome.  There's a little bit there.  They

6   cite the arbitration thing there, and then after that,

7   number 1, who can use the service, who can use it, who are we

8   offering these terms to, and they define the scope of that,

9   and the way they define it in the very first sentence -- this

10  is on page 3 of docket entry 26-3 -- no one under 13 is

11  allowed to create an account or use the services, no one.

12  This child was 11 years old.  She was not within the scope of

13  who they offered, so without an offer, there's nothing for her

14  to accept.  You don't even have to get to consideration.

15  There's no contract formed.  On that very, very basic

16  formation of a contract issue, it fails right out of the

17  gates.

18          Second, the contract is void because it's against

19  public policy, and we've fleshed that out, I think, in our

20  brief, I hope pretty well, but specifically, the public policy

21  is the Children's Online Privacy Protection Act, COPPA,

22  C-O-P-P-A, and that requires parental consent if these

23  companies are going to do business with children under 13.

24  Snap never even tried to do that.  If you look at

25  Miss Reynolds' affidavit, this is -- it's really striking me

1  as I was getting ready for the hearing.  You look at the

2  account creation paragraphs -- this is page 3 of Document

3  26-1 -- paragraphs 9 through 13, that's where they walk

4  through the steps of how you create an account.  You know what

5  they never say in there?  How old are you, what's your birth

6  date.  Never.  Now, that would be very useful to them at this

7  situation; if we -- listen, we asked how old this person was

8  opening the account and they lied to us, they told us they

9  were 21, we did the best we could, we had three different

10  things we did to verify and every time they got around us, but

11  that's not how it works.  When they set this out, all you have

12  to do apparently is put a name in, so the major question of

13  whether they really don't want to do business with children

14  under 13.

15          And it is against public policy -- federal public

16  policy under this -- the COPPA Act for them to engage in

17  business transactions with children under 13 without their

18  parents' consent, and I don't think I need to go into why that

19  is.  It's obvious to all of us.  I have a 10-year-old who's

20  about to turn 11, and I can tell you that my 11-year-old does

21  not have the ability to understand what she's signing off on,

22  and our law for hundreds of years, hundreds of years, has

23  recognized that.  That infancy doctrine goes back to the

24  English common law, that we need to offer extra protection to

25  minors because they are not in a position to negotiate on

1   things, to make decisions for themselves the way adults are.

2   And Snapchat has basically -- they know kids like to use this

3   app, and they have some lip services in these terms about no

4   kids under 13, but they have done nothing, nothing, to prevent

5   children under 13 from signing up for an account without their

6   parents' consent, like happened here.

7         So third, disaffirmance that Your Honor talked to my

8   opposing counsel about for some time.  Any contract that may

9   have been -- you know, existed, it was clearly disaffirmed.

10   Now, disaffirmance is not a defense to a contract.  It's the

11   ability to negate it.  Case law says it makes the contract a

12   nullity, and so it's not a defense.  It's not a response like,

13   you know, mistake or anything like that.  It's the minor's

14   exclusive right to disaffirm that contract, and it goes

15   directly to whether there's an agreement at all.  The right to

16   disaffirm is unconditional.  It can even be unfair to the

17   party on the other side, to the company, and that's

18   intentional.  The law balances those interests that way,

19   because protecting minors from what the case law says is the

20   inexperience and improvidence of youth is more important than

21   a company's business interests in doing some sort of business

22   transaction with that minor, and some of these cases deal with

23   something as big as a car, and it's like, I'm sorry, if you're

24   going to sell this car to that minor, you got to know that

25   they can disaffirm it, and that's just the business risk that

1  you take and it's the business risk that Snap took in offering

2  this application to children.

3       So the -- I actually don't think we have a dispute on

4  what issues the Court has to decide versus what issues may be

5  for an arbitrator.  We're just -- We just have a dispute on I

6  guess how to frame it.  Our issues are all with contract

7  formation, and it sounds like to me there's no dispute that

8  that's for the Court to decide.  Now, scope, what types of

9  claims falls under an arbitration agreement, if there was one,

10  that may be for an arbitrator, but that's not what's before

11  the Court here today.  They've -- Snap's never really argued

12  that contract formation should be decided by an arbitrator, so

13  unless Your Honor has any questions about that, I think I can

14  move on from that point.  Okay.  And I think also on the law,

15  we agree with you, Your Honor, it seems like there's no

16  dispute that Illinois law applies to contract formation, which

17  is what's going on here, and so I don't think we have to spend

18  any time on that either unless you disagree.  Okay.

19       Next, the disaffirmance, as I've said, the law is

20  broad.  Minor's right to disaffirm, of course unconditional.

21  They can disaffirm contracts like this any time while -- not

22  just after they reach the age of majority.  They can do it any

23  time.  The case law also says that they can do it once, get

24  back into a contractual relationship with another party and do

25  it again if they're still a minor, because the same infirmity

1    exists.  They're a minor.  They still have the same, you know,

2    state of mind that minors have.

3          THE COURT:  When she began to use the platform again,

4    was she over the age of 14?

5          MR. LEE:  She wasn't, Your Honor, and actually,

6    that's just a minor clarification.  She's 13.  She's not 14.

7    And I think that's a good point that you raise.  The terms

8    that Snap relies on, let's look at when they were issued and

9    how old was she at that time.  The first one, Exhibit 2 to the

10   motion, that's September 26, 2017.  It was issued when this

11   little girl was 9 years old.  Now, she didn't sign up for her

12   account until January of 2019, so she's a little bit older at

13   that point, and so she's 11 years old when she signs up for

14   the account, and then Snap within a month of that,

15   February 18, 2019, they have those updated terms, issued when

16   she was 11 years old.  The third terms they're relying on,

17   October 30th, 2019, issued when she had just turned 12 years

18   old.  That's how old she was.  She's never over 13 when they

19   issue these terms.

20          And this -- these reflect what Snap claims it

21   negotiated with that child on and entered into a binding legal

22   contract that would forever change a child's constitutional

23   rights.  The imbalance of power in that situation is

24   self-evident and it can't be overstated.  Children defer to

25   adults, they assume they'll be taken care of, and COPPA, the

1   Children's Online Privacy Protection Act, that establishes

2   that public policy as I've already discussed, and it

3   recognizes it's a very important issue when you're dealing

4   with children and how they use the internet, and it's geared

5   all towards parental consent.  We've got to keep these

6   children safe.

7          And so here you have an 11-year-old girl who's

8   chatting with her friends on this application, and Snap has

9   essentially with this type of activity played the posturing

10  ostrich.  They put their head in the sand to ignore age.  They

11  don't want to know age.  They don't ask what the age is.  They

12  don't actually take any steps to avoid these children using

13  the application, and Snap has been aware of this exact issue

14  for a long time.  I'm sure you saw cited in our opposition the

15  settlement with the Maryland Attorney General that Snap

16  entered into in 2014, and that specifically cited this

17  Children's Online Privacy Protection Act and that Snap -- at

18  least the Attorney General said they're not complying with it,

19  and so what did they do?  There's a press release that we have

20  attached about what the settlement was that we attached to our

21  opposition, if I can pull that up real quick.

22          THE COURT:  For what purpose are you offering this to

23  me?  I'm not bound by anything the AG does, right, so --

24          MR. LEE:  Of course not, Your Honor.  I think it's

25  more for a notice issue, that they -- Snap agreed to an

1    injunction, and what they agreed was to comply with COPPA, and

2    for a period of ten years, within the period -- five years

3    into this period that our plaintiff, this little girl, signed

4    up for this account, Snap said that it would take specific

5    steps to ensure children under the age of 13 are not creating

6    Snap accounts.  That's what they said, and so I think there

7    are two issues there.  One, that supports what we're arguing

8    here about public policy, that there's a public policy that

9    protects these kids particularly under 13 years old.  Second,

10   they're asking for equitable relief.  When they say this kid

11   keeps using this platform, you got to enforce the contract,

12   the child can't have the contract enforced against them

13   because they're a minor and they disaffirmed.  I don't think

14   there's any argument that our complaint constitutes

15   disaffirmance even if nothing else does.

16           And so what they're asking is, no, estop her from

17   denying the contract, she's using it, she's got to do the

18   other side of it, these are our terms.  That's an equitable

19   argument, and you can't come to the court asking for equitable

20   relief when you have unclean hands, and that's exactly what's

21   going on.  This is bad faith.  They know that federal law

22   requires them to get parental consent for children under 13,

23   so what do they do?  They bury one line in the terms of

24   service, something no kid is clicking on.  I think we all know

25   that.  They put, you just can't use it if you're under 13, and

1    that's the step that they take to prevent children under 13

2    from using this application?  That is in bad faith, and they

3    cannot come to the Court and ask you to apply equitable

4    estoppel to this child and force these terms of service down

5    their throats when they themselves have not complied with the

6    injunction that's in effect today, today, and they don't even

7    ask these children how old they are when they sign up for

8    these accounts.  That's the reason why this injunctive relief,

9    this settlement, this -- what happened with the Maryland

10   Attorney General, matters here.

11        So, Your Honor, I think Snapchat obviously knows that

12   children use this application.  There's no evidence that

13   they've done anything to avoid it, because Snap actually

14   benefits from children using the app, and they filed their

15   declaration with their reply and we hadn't had much of a

16   chance to respond to that, and so we did file a brief, a very

17   short affidavit with the Court this morning just pretty much

18   saying that mom has done everything she can to prevent this

19   usage, but it's a child.  It's a child.  She's deleted the

20   application off of her child's phone and she's trying to

21   prevent it.  What she doesn't have is a company who's willing

22   to work together to comply with the law.

23        THE COURT:  I haven't seen this affidavit.  Why was

24   it filed this morning?

25        MR. LEE:  Your Honor, because, frankly, we were not

1   expecting a declaration attached to the reply, and when we

2   were preparing for the hearing we saw a new declaration.  We'd

3   seen the declaration in the opening.  We hadn't seen the

4   declaration on the reply.  Now, that's -- I will fall on my

5   sword, Your Honor.  That's my fault, but seeing that

6   declaration and seeing some additional facts in support of

7   this motion that said the child was continuing to use the

8   application, we felt like we needed to put forth what mom has

9   done to prevent her child from using this application, but

10  Snap continues to leave it open.  This is a very --

11        THE COURT:  Excuse me.  Ms. Herrington, have you seen

12  the affidavit?

13        MS. HERRINGTON:  I just was looking at it on my

14  phone, Your Honor.  I hope Your Honor doesn't mind.  I was

15  just looking -- scrolling through it.

16        THE COURT:  Well, you're free do that.  I have not

17  seen it.

18        MS. HERRINGTON:  I just saw it.

19        MR. LEE:  Your Honor, I think we've got a copy of it.

20  I'd like to hand it up.  It's really -- We tried to keep it

21  very short because we knew it was coming here at the

22  11th hour.  May I hand this up?

23        MS. HERRINGTON:  Do you have an extra hard copy?  I

24  couldn't really see it on my --

25        MR. LEE:  I'm sorry.

1              MS. HERRINGTON:  That's okay.

2              THE COURT:  Dana, back to Counselor, and you can

3       share with Ms. Herrington.

4              MR. LEE:  Great.  Thank you.  So, Your Honor, I

5       think, you know, we talked about them agreeing to injunctive

6       relief, and we know that those children under 13 aren't

7       allowed to use the app under the terms.  What Snap really has

8       here, it strikes me as an attractive nuisance for children.

9       It's something they can access easily through their friends,

10      or even like a honey pot, it's out there, like, all their

11      friends are -- it's -- you know, these are, like, making a

12      bunny face on your face when you put these lenses up.  That is

13      not something that's geared towards adults.  It's geared

14      towards children.

15             THE COURT:  I don't know.  I've seen it with adults

16      as well.  I'm not a user, but I've seen it on other platforms.

17             MR. LEE:  That's a fair point.  Not exclusive to

18      kids --

19             THE COURT:  Right.

20             MR. LEE:  -- but I think we can probably agree that

21      it's most attractive to kids.  So Snap knows that this law's

22      out there, because if not before, they were put on notice by

23      the Maryland Attorney General that they've got issues there,

24      but they've continued to allow children to enter into this

25      adult online world and violate the law and violate public

1    policy, and so any agreement that's related to that violation

2    of public policy is void.  The contract is dead on arrival.

3           So, Your Honor, as to the usage after the lawsuit was

4    filed, first, there's no evidence that Snap has done anything

5    to avoid that, and I think you can see, if not before -- we

6    talked about this in our opposition, and the declaration we

7    filed doesn't really go beyond what we talked about in our

8    opposition.  Ms. Clark is trying to be a good mom.  Her

9    daughter is being a normal kid, and Snap is preying on that

10   kid that they knew was underage when she opened this account.

11   Snap knew that Ms. Clark by the time we filed this lawsuit did

12   not want her daughter's biometric information on that

13   application.  They knew that.  And Ms. Clark deleted the

14   potentially dangerous application from her kid's phone, and

15   what did Snap do?  Well, Snap didn't do anything.  They knew

16   what would happen because their whole business model is geared

17   largely towards children, and so they know that children love

18   the app, they know their friends are all over it, they know

19   it's a problem for a lot of people, including an Attorney

20   General, and they waited.  After the suit was filed last fall,

21   they left the account open and they waited, and when the

22   inevitable happened, the child went against what her mother

23   had told her to do and downloaded that application again, they

24   file a declaration, "Got you, you've used it again," and then

25   they still keep it open past that, "Got you again," yet

1    another declaration on the reply.

2         How are parents supposed to do their jobs of keeping

3    their children safe online when companies are constantly going

4    around their clear direction to them?  How can they do that?

5    The mom is making rules and saying you can't use this app and

6    going so far as to file a lawsuit because this company has

7    kept their child's biometric information, and Snap, after the

8    contract is disaffirmed, they continued to leave it open and

9    continue to offer that service any time the child can get

10   around their parents' interests.

11        Your Honor, just one minute to check over my notes,

12   if you don't mind.

13        I would like to talk about Ms. Reynolds' declaration,

14   because we think that the situation is clear because it's a

15   matter of contract formation.  In order, first of all, they

16   didn't make an offer, and then second all, the contract's

17   void, it's against public policy, and third, the contract has

18   been disaffirmed, but if that's -- if anything there is

19   unclear to Your Honor, there are a lot of gaps in this

20   declaration by Ms. Reynolds, and we have a lot of questions

21   about it, a lot of questions about what's -- less what's said

22   and more what's not said.  Document 26-1, Ms. Reynolds is the

23   director of accounting.  It's hard for me to understand how a

24   director of accounting, really more finance issues, would have

25   enough personal knowledge to talk about how these accounts are

1   set up and the process that went through.  The statement that

2   she makes in paragraph 2 is that she's familiar with Snap's

3   accounts.  It's like, okay, but that's a conclusory statement,

4   and it would help to know how, is that reliable.  She's not

5   the one who set it up.  She's not the one who administers it.

6   She's a director of accounting, so how did she come to know

7   this and is it good knowledge, is it actually reliable

8   knowledge.

9          Second, we talked about the account creation.  Now

10  let's talk about the usage.  Paragraph 8, she testifies about

11  this child's usage but she doesn't say how she knows the child

12  used the application.  She doesn't say what records she relied

13  on.  She doesn't say what IP address, which for sure Snap

14  would have those records.  What IP address accessed this

15  account, because it wasn't this child's phone, so what IP

16  address was it?  That'd be really helpful, but it's not in

17  here.  They said that she was viewing and sending chat

18  messages.  Why aren't those attached?  Wouldn't that be great

19  evidence; here she is, you can see this child, or, you know,

20  submit it under seal.  Why no messages?  Why no examples?  Why

21  no raw data in this declaration at all?  Of course it says --

22  the application says nothing about verifying age.

23          Going over to page 3, paragraph 13 -- and this is an

24  issue with several of the allegations here -- there's a

25  screenshot of what they purport, you know, the child would

1    have seen, but who took this picture?  When?  On what device

2    did they take it?  What time period is it from?  Is it from

3    right now?  Was it from, you know, January of 2021?  Does that

4    even relate to what the child would have seen in January of

5    2019?  There's no evidence in the declaration about that, and

6    so all of these screenshots are insufficient to show what the

7    child may have seen on the date that they would need them to

8    see that.

9         Again, paragraph 15, based on Snap's records with no

10   description of what the records are.  Well, why not just

11   attach them?  Why not attach that?  There's a best evidence

12   issue here too.  What's the best evidence of what the records

13   reflect?  It's the records.  It's not what a director of

14   accounting says about these records.

15        Flipping over to page 5, they cite an opt-out

16   provision, an opt-out provision that's in those terms of

17   service.  I wonder if any minor has ever sent -- ever sent an

18   opt-out notice to Snap?  That's an issue that should be

19   addressed.  Are minors participating in this?  Are they really

20   able to see these terms of services?  Are they able to do what

21   adults would do?  I think we'll find the answer's no, but it's

22   an open question right now.  There's no way for us to know and

23   Snap knows it, and we need to explore that.

24        The next, the screenshot that's on the bottom of

25   page 5 here, there's some language here that's blocked, that

1   it looks interesting to me.  The second bullet point says, "We

2   clarify what rights you grant us when you" -- and then the

3   rest of it's blocked out because of the pop-up.  Why is that

4   blocked?  What did it say?  Was there any notice about an

5   arbitration provision or any changes or anything in that?  I

6   don't think so.  They don't say it, but you can't really see.

7   They also say that all existing users who upgraded the

8   Snapchat were presented with this, but they never say that

9   this user upgraded Snapchat.  They just said that all users

10  do, and then they go and say that the plaintiff accepted it.

11  I don't know.  There's space there.  I'm not really sure.  Did

12  she upgrade the app?  Did she then separately accept it?  What

13  are you relying on, and again, where are these records?  Where

14  are these records?  And, you know, when it would be so good to

15  the argument for them, why hide the ball?  Why not present it?

16  It makes us as advocates on the other side very, very

17  interested in why.  Why are we not seeing these documents,

18  this raw data?  Again, all existing users upgraded but no

19  indication that this user upgraded.

20        Then on paragraph 29, another screenshot talking

21  about updating the terms and privacy policy, but there's, you

22  know, four paragraphs in that screenshot but nothing about

23  arbitration or anything like that.  Yeah, and that -- so

24  that's just some examples of things that are left entirely

25  open by this declaration, if Your Honor is not clear whether

1    or not -- not clear that there was not a contract formed here

2    for the reasons that we've gone over.

3              Your Honor, do you have any specific questions for me

4    that I can address?

5              THE COURT:  I don't.

6              MR. LEE:  No?  Okay.  I think that's all that I have.

7    One other point, if I may, just two minutes.  We talked about

8    the disaffirmance and why the infancy doctrine exists the way

9    that it does, and Snap of course is arguing that this child is

10   bound by Snap's contract, and I want to look very, very

11   briefly at the terms, the terms that this child is bound by,

12   this 11-year-old.  There's a license provision.  This contract

13   purports to grant Snap -- on page -- this is Exhibit 26-3 in

14   the docket, page 4 -- purports to grant Snap and its business

15   partners the unrestricted worldwide perpetual right and

16   license to use this child's name, likeness and voice,

17   including in connection with commercial or sponsored content,

18   with no compensation.  Is that something that we want a child

19   to be able to agree with and for that to be enforceable as to

20   an 11-year-old, they can give Snap the unrestricted worldwide

21   perpetual right and license to use their name, likeness and

22   voice?  It's no different than the term on the arbitration

23   provision in that way.  Is it something that an 11-year-old

24   can agree to and then not be able to disaffirm?  And then of

25   course we've got the arbitration provision, something -- about

1   something complex and very, very important, arbitration,

2   waiving a fundamental right to a jury trial under the Seventh

3   Amendment to the United States constitution.  These are

4   patently issues that children shouldn't be dealing with and

5   issues that when they come to the court under the infancy

6   doctrine they have the unconditional right to disaffirm.

7   Thank you, Your Honor.

8           THE COURT:  All right.  Thank you.  Ms. Herrington?

9   While you're coming up to the microphone, one thing that

10  strikes me about this particular case, I think the parents of

11  the plaintiff probably have expressed in the most clear way

12  possible -- that is, to file a lawsuit -- that their desires

13  that their child not to contract with or have anything to do

14  with Snapchat.  Counsel raises the issue, quite well, I think,

15  is that Snapchat disregards that, I understand now on two

16  occasions, maybe for the purpose of setting a snare, I don't

17  know, but what does stand out to me is -- and I think what's

18  poignant is Counsel's argument that Snapchat is disregarding

19  COPPA, has a history of disregarding COPPA, is continuing to

20  disregard COPPA in this particular case, so I'm curious about

21  those things.  How does your client wish to respond to that?

22          MS. HERRINGTON:  Sure.  Thank you, Your Honor, and I

23  did just take a look at the declaration.  I want to step back.

24  We are not saying before Your Honor that the plaintiff cannot

25  bring a BIPA claim, so this argument about, you know, she gave

1    up a fundamental right, she can assert her BIPA claim.   We

2    think it's meritless, but what we're saying is is per the

3    terms that it belongs in arbitration as opposed to court.   So

4    we're not saying that she's without any type of remedy.   It

5    just belongs in arbitration.   But to answer Your Honor's

6    question --

7            THE COURT:   Let me ask you this:   Does the AAA have

8    the ability to enter injunctive relief, for example?

9            MS. HERRINGTON:   It does, is my understanding.

10   That's my understanding.   I don't have the rules in front of

11   me, but my understanding is --

12           THE COURT:   To apply extraterritorially beyond the

13   scope of this case?   I mean, I can think they can enjoin

14   Snapchat as to this particular plaintiff and members of the

15   class, but generally do you think that they have the power to

16   enter injunctive relief?

17           MS. HERRINGTON:   As far as this individual plaintiff,

18   yes, I believe that they do, and that's what's before Your

19   Honor right now.   There is no class, just this plaintiff.   But

20   I do believe that that's part of the AAA's remedies.

21           THE COURT:   That's not where I'm headed, but

22   sometimes thinking about things in those ways helps us to

23   enlighten ourselves on this particular claim at a different

24   level, but go ahead.

25           MS. HERRINGTON:   Sure, sure.   As far as the fact that

1  we did not delete her account, she herself signed up for the

2  account, and there is a very easy way for either the plaintiff

3  or the plaintiff's mother or father to delete her account, and

4  while I was just sitting here and I looked at their

5  declaration, I googled how to delete a Snapchat account.

6  People that sign up for their accounts are in charge of their

7  accounts, as Your Honor would expect.  There is a very simple

8  way, a guide that just says -- and it pops ups on -- I don't

9  know.  I was able to scroll through many articles.  The first

10  one that pops up is from Snap itself, how do I delete my

11  account.  It's on the Snapchat web page if you look on -- you

12  know, on Google.  There's also articles about how do I delete

13  my child's Snapchat account.  So there is a way for the

14  Snapchat account to have been deleted, but I don't know that

15  in this particular instance where a lawsuit was filed that

16  Snap would ever be in the situation where they would

17  automatically then delete somebody's account.  I mean, I could

18  see a lot of problems with that.  There could be a lot of --

19          THE COURT:  We know historically, just over the last

20  election cycle, without deleting accounts, platform

21  administrators have the ability to stop usage, true?

22          MS. HERRINGTON:  I believe so, yes.

23          THE COURT:  And that's different than deleting an

24  account, right?

25          MS. HERRINGTON:  I agree, that's true.  That's true,

1    but I also believe that if the account -- if this was a

2    situation where, you know, either the plaintiff herself or the

3    plaintiff's parents wanted her account deleted, that there is

4    an easy way to do that, and frankly, before we saw the

5    declaration this morning, that really wasn't an argument they

6    were making.  They now shifted to sort of say, well, you know,

7    I'm not aware of a parent like myself to terminate a child's

8    Snapchat account.  Well, like I said, a Google search -- and

9    we'd be happy to put in evidence, if Your Honor would like, in

10   response to this, but a simple straightforward search would

11   show how to delete an account if indeed the plaintiff or her

12   parents were unhappy with her usage of it, and that's

13   something that, again, we don't believe that the plaintiff's

14   claim here has any merit, but I don't believe that Snap should

15   be responsible for once they receive a copy of a complaint, no

16   matter how frivolous or meritless we might conclude it to be,

17   that someone isn't happy with their usage of Snapchat that

18   Snapchat then goes in and takes it upon itself to delete the

19   user's account.  I don't believe that that is -- I think

20   that's contrary to our terms of service that we would

21   arbitrarily get to decide, you know, when somebody's complaint

22   would reach the level where we're going to delete it.

23           THE COURT:  Excuse me.  What does COPPA say about

24   shifting the responsibility back to the parents?

25           MS. HERRINGTON:  Right.  So COPPA -- So to go with

1    the Maryland Attorney General, the settlement, that was the

2    cite -- the article they cite was a decade-old settlement with

3    the Attorney General of the State of Maryland, and there Snap

4    agreed to address the use of the app by young children by

5    complying with COPPA and taking specific steps to ensure the

6    app wasn't being used by children under 13.  They reached this

7    resolution, and as part of that, they agreed to place a clear

8    statement, you may not sign up for this unless you are the age

9    of 13.  Now, we know in this case that the plaintiff

10   disregarded that, disregarded it and signed up anyway.

11           THE COURT:  Are you surprised by that?

12           MS. HERRINGTON:  Well, Your Honor, I mean, they're

13   making a very interesting, you know, policy argument that is

14   not relevant to whether or not the plaintiff should be

15   required to arbitrate her claims.  That's a broader policy

16   issue perhaps, you know, for congress and others, are these

17   platforms required to make a, you know --

18           THE COURT:  I'm aware of my lane.

19           MS. HERRINGTON:  I'm not trying to say -- Your lane

20   can be whatever Your Honor wants.

21           THE COURT:  No, I'm aware of it and I respect it, but

22   it still concerns me, just the fact that this matter's before

23   the court and that chat -- Snapchat is leaving an account

24   available to be used when the expression from a parent that

25   they do not wish for that child to use that account is

1    disregarded or permitted or whatever.  That concerns me a

2    little bit, because I think in your arguments you actually

3    brought that to this Court's attention that, gee, she's still

4    using it, Judge, how can she disavow, so I think Counsel makes

5    a good point that, well, it might be, but it really proves

6    their point that Snapchat is disregarding age limitations,

7    which is disregarding COPPA.

8         MS. HERRINGTON:  Right, but COPPA does not say that

9    minors cannot use online platforms.  I understand -- I mean,

10   we've dove deep into COPPA for purposes of briefing, but the

11   settlement really had to do with whether or not that sort of

12   disclaimer of no one -- you know, you should not sign up if

13   you are under 13, but as far as the deleting of the account,

14   Your Honor, I understand what Your Honor's asking in whether

15   that we had some type of obligation to delete her account once

16   she filed a suit against us, but I'd also say that there is

17   an -- there is also accountability on behalf of the individual

18   and their parents.  I have a 9- and 12-year-old.  If they are

19   using an app that I don't want them to use, I figure out how

20   to delete the account, not just off of their iPhone, or better

21   yet, don't allow them to have access to electronic devices if

22   you believe that they're -- that your 13-year-old is incapable

23   of not using a platform like this.  But there has to be

24   accountability on the other side.

25         I don't think that Snap should be in a position for

1   policing everywhere around the country if a complaint is filed

2   for any reason based on the use of a minor's Snapchat account

3   that they should then have the legal responsibility to say,

4   oh, you've sued us, we're going to go ahead and we're going to

5   delete your account.  Rather, we're saying here that her claim

6   belongs in arbitration because even though her mother's

7   unhappy with her usage of Snapchat, she continues to use it

8   and then have the benefit, I mean, a benefit of talking to her

9   friends, sending videos, and I don't know that as a matter of

10  public policy -- I mean, they're talking here about public

11  policy, and under Illinois law, it has to be so capable of

12  producing harm that its enforcement would be contrary to the

13  public interest.

14        So they're saying here, Judge, don't enforce an

15  arbitration agreement that's part of the terms and service

16  because it's so capable of producing harm, enforcement would

17  be contrary to the public interest.  That is a very high

18  burden.  I mean, remember, the allegations in this complaint

19  are that she was using it.  Plaintiff or plaintiff's counsel

20  believes that somehow it violates BIPA, but there's no

21  allegation that there has been any actual harm, like injury to

22  any plaintiff here.  It's a statutory violation they claim

23  that the software -- we completely disagree with this -- has

24  somehow used facial recognition technology.  That's meritless.

25  But this public policy issue is a very, very high standard,

 1   and I don't believe that the facts here show that an

 2   arbitration agreement within terms of service accepted three

 3   times by a plaintiff would rise to the level to say, you know

 4   what, there was a contract, a binding contract here, but we're

 5   going to say as a matter of public policy that you can never

 6   have a binding arbitration agreement with somebody who's under

 7   18.  That is such a high hurdle, and I don't believe that the

 8   facts warrant it in this particular situation.

 9          And as far as the Maryland Attorney General, I want

10   to be clear, Snap complied with the terms of that settlement

11   agreement.  I mean, the record shows that Snap complied.  The

12   press release the plaintiff attached to her opposition noted

13   that companies that operate on the internet or mobile devices

14   have a responsibility to protect the user's privacy and be up

15   front about what personal information they collect and the

16   permanency of their uploaded files.  The record before Your

17   Honor, the undisputed record, is that Snap is up front about

18   what personal information it collects.  Snap's robust privacy

19   policy shows -- what they must agree to it before they use

20   it -- exactly what is collected by Snapchat, and the

21   plaintiff's claim that Snap failed to take any reasonable

22   measures to screen, prevent or protect underage users, it is

23   undermined by the very first page of Snap's terms, which state

24   that no one under 13 is allowed to create an account or use

25   the services.  I mean, their argument is that despite that,

1   that there should be an additional step, because we can't have

2   somebody who's 13 years old -- we should never suspect that

3   they should comply with the rules and the -- the rules that

4   they have to follow when they sign up for an account.  That's

5   their argument, and that therefore, because a 13-year-old

6   cannot be -- you know, cannot read this language and comply

7   with it, if they disregard it, that somehow they still get the

8   benefit of using Snapchat and communicating with all of their

9   friends when they want to, but then when it comes time to sue

10  Snapchat, they can say, you know what, I'm going to use it as

11  a sword, I'm going to say, no way; now I'm going to say, you

12  know what, I'm going to disregard the contract; I've used it

13  for three years, I've received all of this benefit under the

14  contract, and now that she's decided to file the suit, she

15  says, well, I'm going to just -- I'm going to void it, I'm

16  going to say I'm absolutely not going to arbitrate my claims,

17  I'm going to proceed exactly as if I'd never received the

18  benefits.  And I think Illinois law is very clear on this

19  point as far as the *Sheller* case that I cited and also, you

20  know, in the other cases that we have throughout Illinois.

21  I've cited the --

22          THE COURT:  Doesn't *Sheller* kind of carve out a very

23  narrow exception to the rule?

24          MS. HERRINGTON:  It actually doesn't, Your Honor.  I

25  mean, the plaintiff had argued that it was only in the

1   employment context, but there's no -- there is absolutely

2   nothing in the decision that shows that it is only in the

3   employment context.  It shows there exactly the principle that

4   I was explaining, that when somebody has the benefit, a minor

5   has the benefit, has benefited from a contract, that they

6   can't then turn around and disaffirm parts of the contract or

7   disavow parts of the contract that doesn't please them, and

8   that's what's happening here.  That's exactly what's happening

9   here, but -- so I don't -- I do not believe that -- I think

10   the *Sheller* case is very much in our favor in Illinois, but

11   there's also other cases, Your Honor.  I mentioned the *E.K.D.*

12   *v. Facebook* case, the *Kuznik v. Hooters of America*.  There are

13   other cases, Your Honor, where a minor has entered into an

14   online contract and then there is a formation of a contract.

15            I guess I'd also just again go back to a point that I

16   made previously, and that is, if Your Honor looks and says,

17   you know what, a contract was formed here, I believe that

18   pursuant to the terms that any arguments about whether then it

19   can be void or voidable or should not be enforced need to be

20   presented to the arbitrator, and that's clear under the terms

21   of use and I believe that that decision very clearly has been

22   delegated to the arbitrator, so for today's purposes, again,

23   it's just a matter of was there an actual contract.  Here, the

24   plaintiff really is -- what he's doing is conflating the issue

25   of whether there was contract formation with the issue of

1   whether the plaintiff can now disavow it by virtue of their --

2   of her minority or infancy, but the issue really, if you look

3   at the papers, isn't whether there was a valid contract.

4   There was.  There was an offer, acceptance and consideration

5   as part of this contract, but what they're really saying is

6   that the arbitration provision is not enforceable because of

7   virtue -- the fact that she was originally 11 and now 13, has

8   affirmed her consent to the terms.  The delegation clause and

9   the terms of use make it very clear that the arbitrator has to

10  decide that issue.

11          One last thing.  At the end of his argument, the

12  plaintiff's counsel stood up and went through some of the

13  paragraphs of the declaration of Miss Reynolds.  Those

14  arguments were never made in opposition to our motion to

15  compel arbitration.  As a matter of fact, there was no

16  declaration whatsoever attached to the plaintiff's opposition,

17  so the arguments that he's making about certain paragraphs and

18  whether they'd like more information, that should not be part

19  of the consideration of the Court on this matter.  You know,

20  under the case law, it's akin to almost a summary judgment

21  standard, as I'm sure Your Honor knows, and once we've

22  presented sufficient evidence, we believe that Miss Reynolds'

23  declaration was sufficient evidence of showing you exactly how

24  the contract was formed here, then the burden shifts.  They

25  did not meet their burden to challenge any of the parts of the

 1   very thorough declaration that we submitted, and we submit,

 2   Your Honor, that it does show a binding contract and that they

 3   should be -- plaintiff should be compelled to arbitrate her

 4   claim she has asserted here as a result of the binding

 5   contract.

 6            THE COURT:  All right.  Thank you, Counsel.

 7            MS. HERRINGTON:  Thank you.

 8            THE COURT:  We'll certainly take it under advisement

 9   and issue an order.  Just so everybody's concerns are at rest,

10   it's my intention to stay within my lane.  I'm not here as a

11   policymaker.

12            MS. HERRINGTON:  No, no, and, Your Honor, I hope you

13   didn't --

14            THE COURT:  No, no, not at all.  I just want to make

15   sure the record's clear.  I'm not a policymaker.  I'm going to

16   follow whatever the -- I'm told to do by the Seventh Circuit

17   and the Supreme Court and in some instances the Illinois

18   Supreme Court and Appellate Courts when this comes to their

19   law, so no worries there.  In terms of summary judgment,

20   getting outside the borders of what summary judgment is, I can

21   discern that, so I'm not worried about that either.  So give

22   us a little time.  We'll go through the -- I know it's

23   important to everybody.  We'll give it its due time and course

24   and we'll get you an opinion as soon as we can.  I think the

25   discovery still remains stayed, the merit discovery?

1          MS. HERRINGTON:  That's right.

2          THE COURT:  And I think everybody's -- as you've

3     indicated, Counselor, that the motion to dismiss is stayed as

4     well, okay?  So anything else we need to do today?

5          MS. HERRINGTON:  Thank you, Your Honor.

6          THE COURT:  All right.  Thank you for your time.

7               (Court adjourned at 11:02 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              -oOo-

2                    REPORTER'S CERTIFICATE

3         I, Karen E. Waugh, CSR, RPR, CRR, Official Court

4    Reporter for the U.S. District Court, Southern District of

5    Illinois, do hereby certify that I reported with mechanical

6    stenography the proceedings contained in pages 1 - 46; that

7    the same is a full, true, correct and complete transcript

8    from the record of proceedings in the above-entitled matter.

9

10        DATED this 6th day of August, 2021.

11

12

13

14         /s/Karen E. Waugh, CSR, RPR, CRR

15

16

17

18

19

20

21

22

23

24

25